**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LAMAR PHILLIPS,<br><br>   Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC; AND TRANS UNION LLC,<br><br>   Defendants. | Case No.: 1:22-cv-01909<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL**<br><br>1. **FCRA, 15 U.S.C. § 1681** *et seq.* |

  Plaintiff Lamar Phillips ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendants Equifax Information Services, LLC ("Equifax") and Trans Union LLC ("Trans Union") (referenced collectively as "Defendants").

### I. INTRODUCTION

  1. Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* by the Defendants. Plaintiff contends Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's "consumer reports" as defined in 15 U.S.C. § 1681a(d), and consequently reported inaccurate information about Plaintiff. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

### II.

1

### III. JURISDICTION AND VENUE

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the Fair Credit Reporting Act, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3. Venue in the Northern District of Illinois is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### IV. PARTIES

4. Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5. Plaintiff is a natural person who resides in Chicago, Cook County, Illinois.

6. Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

7. Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of "consumer reports," as defined in 15 U.S.C. § 1681a(d)), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309.

8. Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f)). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans

Union can be served at their Registered Agent Prentice Hall Corporation at 801 Adlai Stevenson Drive, Springfield, IL 62703.

9. During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Illinois and conducted business in the State of Illinois on a routine and systematic basis.

10. Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

11. During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

12. Any violations by Defendants were not in good faith, were knowing, negligent, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## V. FACTUAL BACKGROUND

13. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

14. The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is

essential to the continual functioning of the banking system.

15. Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

16. The FCRA is intended to ensure consumer reporting agencies ("CRAs") exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because CRAs have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

17. Defendants, two of the three major consumer reporting agencies (at times referred to collectively as "the CRAs," and individually as a "CRA") in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

18. Defendants regularly purchase and obtain consumer bankruptcy information to include in consumer reports.

19. Defendants' consumer reports generally contain the following information: (i) <u>Header/Identifying Information:</u> this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

20. Defendants obtain consumer information from various sources. Some consumer information is sent directly to Defendants by furnishers, and other information is independently gathered by Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

21. Defendants regularly seek out and procure consumer bankruptcy filing and discharge information, with the intention of including it in the consumer reports Defendants sell to third parties for a profit.

22. The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

23. Defendants' unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

24. Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

25. The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions.

26. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendants' reports.

27. The information Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

5

28. FICO Scores are calculated using information contained in Defendants' consumer reports.

29. FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

30. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

   a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be. A collection account is highly damaging to credit scores.

   b. The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

31. Lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

32. DTI compares the total amount a consumer owes to the total amount a consumer earns.

33. Defendants regularly provide information that allows lenders to calculate the "total amount of debt" a consumer owes based on the total debt reported by Defendants.

34. A consumer's income, however, is not included in their consumer report; only their "amount of debt" is.

35. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest rates and lower credit limits).

36. Upon information and belief, a consumer who has obtained a bankruptcy discharge and has an account that is inaccurately reporting with outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting with a zero-dollar balance, especially if that account is an open "collection" with a balance owed, as is the case here.

37. The CRAs (through their Consumer Data Industry Association) created, maintain, and license the industry guidelines to furnishers through the Credit Reporting Resource Guide® ("CRRG"), detailing how furnishers should report consumer data to the CRAs using the Metro 2 Format and codes.

38. The 2020 CRRG, page 10-1, states that "Accounts of consumers who have filed petitions for Bankruptcy (Third Party Collection Agencies) . . . **must be deleted**."

39. Thus, Defendants are aware that collections for debts which were included in a bankruptcy should be deleted from a consumer's credit report following the filing of a bankruptcy.

40. Defendants are aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged.

41. However, Defendants also know that it is rare for a pre-petition debt to be reaffirmed or successfully challenged in an adversary proceeding.

42. Further, Defendants know that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket sheet.

43. Additionally, information indicating whether a specific debt was reaffirmed or successfully challenged through an adversary proceeding (rather than discharged), can be easily retrieved from the same sources from which Defendants independently obtain consumer bankruptcy case information.

44. Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

45. Despite the availability of accurate consumer information, Defendants regularly report inaccurate information about accounts after consumers receive a Discharge Order.

46. Defendants' unreasonable policies and procedures cause it/them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

47. Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts based on information they know is incomplete or inaccurate.

48. Consequently, Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to Defendants, already included in Defendants' credit files, contained in public records that Defendants regularly access, or sourced through Defendants' independent and voluntary efforts.

8

49. Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

50. Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, information provided by furnishers, and data contained in Defendants' own files.

51. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

52. Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures. More specifically, Defendants are on continued notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

*Allegations Specific to Credit Reporting of Plaintiff*

53. Plaintiff filed a Chapter 13 Bankruptcy on or about February 20, 2017, in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) (Case No. 17-04819).

54. Plaintiff converted his Chapter 13 Bankruptcy to a "no asset" Chapter 7 Bankruptcy on June 30, 2020.

55. Plaintiff received an Order of Discharge on or about September 30, 2020.

56. Thereafter, Plaintiff was not personally liable for any of their dischargeable debts. Upon entry of Plaintiff's Discharge Order, all of Plaintiff's dischargeable debts had zero-dollar balances.

57. Upon information and belief, Defendants each prepared one or more consumer

reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

58. Defendants obtained notice of Plaintiff's bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by Defendants in Plaintiff's consumer reports.

59. In the Public Records section of Plaintiff's consumer reports, Defendants each included the bankruptcy case number, court, filing date, and the fact that Plaintiff's bankruptcy had been discharged.

60. Defendants also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

61. Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

62. In or around January 2022, each Defendant inaccurately reported a Medical Business Bureau collection account (the "Account"), starting with 121106 .

63. The original creditor for the debt was listed on the Account as Rush University Medical Center.

64. The original debt was incurred before Plaintiff converted his bankruptcy to a Chapter 7 bankruptcy and therefore, was discharged in Plaintiff's bankruptcy.

65. Defendants also continues to update the Status Date every month, effectively re-

aging the impact to Plaintiff's credit scores.

66. Equifax and Trans Union inaccurately reported the discharged Account with a past due balance of $1,017, instead of a zero-dollar balance, or not reporting the Account at all.

67. The Account should not have been reported by Defendants as an open collection being updated every month; at a minimum it should have reported as closed with a zero balance.

68. Alternatively, the Account should not have been reported at all, in compliance with the CRRG industry standard.

69. Notably, one the other national consumer reporting agencies, Experian, did not inaccurately report the Account such as Equifax and Trans Union did.

70. Defendants do not have reasonable procedures in place to detect and correct pre-Chapter 7 debts which continue to report collection balances after Defendants reports a discharge.

71. Defendant knew that the original debt (which became delinquent in June 2019), occurred long before Plaintiff converted his bankruptcy to a Chapter 7 bankruptcy.

72. Upon information and belief, Medical Business Bureau furnished information to Defendants that indicated Plaintiff's Account was included or discharged in bankruptcy, and/or had a zero-dollar balance after the bankruptcy discharge, but Defendants rejected or otherwise overrode the data they received.

73. Alternatively, Defendants knew from past experiences that Medical Business Bureau furnished inaccurate information regarding discharged debts or, has historically failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

74. Nevertheless, Defendants blindly relied on the information provided by Medical Business Bureau even though it conflicted with information contained in Defendants' records,

11

contradicted other information Defendants reported about Plaintiff, was in violation of the CRRG, and/or neglected Defendants' knowledge regarding Plaintiff's bankruptcy and discharge.

75. If Medical Business Bureau did not furnish data to Defendants that the Account was discharged, Defendants' blind reliance on the furnisher, Medical Business Bureau, was unreasonable.

76. Further, Defendants knew, from their own CRRG guidelines, that Defendant should not report a collection for discharged debt, even if the furnisher reported the information to Defendants.

77. Defendants inaccurately reported that Plaintiff owed a balance that Plaintiff did not actually owe, and also reported inaccurate account statuses.

78. Defendants inaccurately reported the Account with a balance owed and past due after the Account was discharged in Chapter 7 Bankruptcy and therefore had a zero-dollar balance.

79. Defendants failed to indicate that the Account had a zero-dollar balance and/or was discharged in Chapter 7 Bankruptcy.

80. Pursuant to Defendants' own CRRG guidelines, Defendant should not have reported any collection for debt which predated Plaintiff's bankruptcy.

81. Defendants' reporting of the Account is patently false and therefore inaccurate.

82. If not patently false, Defendants' reporting of the Account is materially misleading and therefore inaccurate.

*Plaintiff's Damages*

83. Upon information and belief, had Defendants accurately reported the Account with a zero balance, Plaintiff's credit scores would have been better.

84. Open collection accounts with balances are especially harmful to a consumer's

FICO and other credit scores, especially after a bankruptcy discharge.

85. FICO scores treat a single collection account nearly as derogatory as a bankruptcy filing in terms of credit score loss.

86. Defendant's reporting of an additional $1,017 of debt which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

87. The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

88. In or around January 2021, after Plaintiff's bankruptcy discharge but before the inclusion of the Account on his consumer report, Plaintiff purchased a 2014 Grand Cherokee. After Plaintiff spent about a year making timely payments on his open accounts, Plaintiff decided to attempt to refinance his vehicle. In or around November 2021, after the Account was included in his consumer report, Plaintiff attempted to get his 2014 Grand Cherokee loans refinanced, but he was unable to obtain more favorable terms for the loan and therefore decided not to go through with it.

89. Plaintiff has also applied for a credit card with JPMorgan Chase Bank and was denied due to the inaccurate reporting by Defendants.

90. Defendants' inaccurate reporting of the Account, along with additional information belonging to Plaintiff, was published to JPMorgan Chase Bank Card Services, Prestige Financial, Regional Acceptance Corporation, Tidewater Finance Corporation, Consumer Portfolio Services, Hawk Chrysler Dodge, Flagship Credit Acceptance, TBOM Vervent Total Visa, Wells Fargo Dealer Services, Capital One Auto Finance, Santander Consumer USA, and Ally Financial by

Defendant Trans Union during the process of Plaintiff's credit applications. Defendants' inaccurate reporting of the Account, along with additional information belonging to Plaintiff, was published to Global Lending Services, Consumer Portfolio Services, First Investor Financial, and Capital One by Defendant Equifax during the process of Plaintiff's credit applications.

91. As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, credit denials, and other financial harm.

92. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, humiliation, loss of sleep, headaches, stress, anger, reputational damage, invasion of privacy, frustration, shock, embarrassment, and anxiety.

## VI. COUNT I
### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

93. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

94. The FCRA requires CRAs, like Defendants, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

95. Defendants negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of the information they reported about Plaintiff's pre-bankruptcy debts after Plaintiff received a Discharge Order.

96. Defendants independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily included it in Plaintiff's consumer reports.

97. When Defendants voluntarily procured and reported Plaintiff's bankruptcy information, and pre-petition accounts, they had an obligation to follow reasonable procedures to

ensure they reported the bankruptcy discharge and its effect(s) with maximal accuracy.

98. Defendants received notice of Plaintiff's bankruptcy discharge through public records, their own files, and information provided by data furnishers.

99. Individual furnishers of account information also notified Defendants of Plaintiff's bankruptcy, as evidenced by other tradelines in Plaintiff's consumer report that are labeled included and discharged in bankruptcy.

100. Defendants had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information they published in Plaintiff's consumer reports, including Plaintiff's bankruptcy case number, court, date of filing, and date of discharge.

101. Defendants also had actual knowledge that the debt for which Medical Business Bureau was collecting was discharged in Plaintiff's bankruptcy.

102. But despite knowledge of Plaintiff's bankruptcy and the discharge of the subject debt, Defendants inaccurately reported the Account, which predated Plaintiff's Chapter 7 Bankruptcy, with a status other than "discharged in bankruptcy" and a balance greater than zero.

103. Defendants knew or should have known of their obligations under the FCRA, especially those pertaining to reporting discharged debt with a zero-dollar balance.

104. These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and exemplified in prior cases involving Defendants from which Defendants are on notice of their unreasonable procedures concerning the reporting of discharged debts.

105. Additionally, Defendants possess or could easily obtain substantial written materials that detail CRAs' duties and obligations under the FCRA, including those arising after a consumer files for Chapter 7 Bankruptcy.

106. Despite knowledge of these legal obligations, Defendants willfully and knowingly breached their duties in violation of 15 U.S.C. § 1681e(b). Accordingly, Defendants deprived Plaintiff of Plaintiff's rights as a consumer under the FCRA.

107. Not only did Defendants have prior notice of their unreasonable procedures for reporting discharged debts, but they also possessed information from which they should have known the information reported about Plaintiff was inaccurate.

108. Defendants knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

109. Defendants know that discharged pre-petition debts should not be reported as late, past due, as collections, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

110. Further, Defendants' own industry guidelines in the CRRG state that collections for debts included in bankruptcy should be "deleted" from consumer reports.

111. Yet in this case, Defendants reported the damaging collection Account, the debt for which Defendant knew predated Plaintiff's bankruptcy, with a balance owed (instead of a zero-dollar balance) after it was discharged.

112. Alternatively, Defendants did not delete the collection Account from Plaintiff's consumer report, in compliance with the CRRG.

113. Defendants violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/consumer report.

114. Defendants also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendants knew or should have known the information they were reporting is inaccurate, and/or otherwise contradicted by information known by Defendants, reported to Defendants, and reasonably available to Defendants.

115. Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

116. Alternatively, Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

117. Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

118. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and failing to delete the Account, in compliance with the CRRG.

119. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, loss of sleep, reputational harm, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

120. Defendants are direct and proximate causes of Plaintiff's damages.

121. Defendants are substantial factors in Plaintiff's damages.

122. Therefore, each Defendant is individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

### VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a) Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b);

(b)     An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)     An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)     An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

(e)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VIII.   JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 13th day of April, 2022,

        **PRICE LAW GROUP, APC**

        By: /s/Beth Findsen
        Lisbeth Findsen (SBN: 24002679)
        **PRICE LAW GROUP**
        8245 N. 85th Way
        Scottsdale, AZ 85258
        T: (818) 600-5575
        F: (818) 600-5475
        E: beth@pricelawgroup.com

        By: /s/ Syed H. Hussain
        Syed H. Hussain, Esq. (IL #6331378)
        PRICE LAW GROUP, APC
        420 E Waterside Dr #3004
        Chicago, IL 60601
        T: (818) 600-5535
        E: syed@pricelawgroup.com